**LEE–MOORE OIL COMPANY, Plaintiff,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant.**

**No. C–74–17–D.**

United States District Court,
M. D. North Carolina,
Durham Division.

Nov. 23, 1977.

Robert S. Hodgman and Lawrence Egerton, Jr., Greensboro, N. C., for plaintiff.

Bynum M. Hunter, Greensboro, N. C., Murray S. Monroe and G. David Schiering, Cincinnati, Ohio, for defendant.

## MEMORANDUM OPINION

GORDON, Chief Judge.

This matter is before the Court for a determination of the defendant's motion for summary judgment. For the reasons which follow, the Court concludes that the motion should, in part, be allowed.

On October 10, 1973, the plaintiff instituted this action in the United States District Court for the Southern District of Ohio. In its complaint, the plaintiff alleged that the defendant had violated, and was continuing to violate, the antitrust laws. 15 U.S.C. §§ 1, 2, and 14. In particular, the plaintiff has alleged that the defendant, consciously aware of the actions of other major oil companies, has combined, with parallel action with these other major oil producers, to eliminate and monopolize the jobber-serviced market in the plaintiff's

area of business. In pursuit of this alleged combination and conspiracy, the plaintiff asserts that the defendant, in conscious parallelism with other major oil companies, has refrained from expanding its refining capacity, and further, has represented to the public that there was, and is, an oil shortage that should continue into the future. The plaintiff further asserts that on the basis of this action, the defendant and others, with awareness of their parallel action, have curtailed the supply of gasoline to existing jobbers so as to favor corporate-owned marketing outlets. Pursuant to this alleged scheme, the plaintiff contends that the defendant has terminated its supply contract with the plaintiff for the supply of gasoline. The plaintiff asserts that this action has, and will continue to result in the elimination and monopolization of the jobber-serviced market in the plaintiff's area of business. Moreover, the plaintiff contends that the defendant is consciously aware of this anticompetitive result, and further, that the other major oil producers are consciously following a similar course of action in an effort to totally eliminate the jobber market.

The plaintiff contends that the defendant is acting with the intent to monopolize the market serviced by the plaintiff, and further, that this conduct has produced, or will produce, a dangerous probability of a monopoly in violation of 15 U.S.C. § 2. Additionally, the plaintiff alleges that this course of conduct constitutes a combination, between the defendant and the defendant's own outlets and customers, in unreasonable restraint of trade and commerce, 15 U.S.C. § 1, and further, violates the antimonopoly provisions of the Act. 15 U.S.C. § 2. In addition to these alleged violations, the plaintiff asserts that the defendant, with conscious awareness and in conscious conjunction with other major oil producers, has combined to monopolize the jobber market in North Carolina. 15 U.S.C. § 2. Moreover, the plaintiff contends that the defendant has intentionally participated in a combination in unreasonable restraint of trade in violation of 15 U.S.C. § 1. The plaintiff asserts that the defendant has followed this course of conduct for the specific purpose of stifling free competition, and further, that the actual effect of this action is to lessen competition in violation of 15 U.S.C. § 1. As a result of these alleged actions by the defendant, the plaintiff contends that its business has been damaged and that it has suffered a substantial loss in profits and business.

By way of summary, the plaintiff, in support of its allegation that the defendant has violated the antitrust law, alleges a combination or intentional course of activity on the part of (1) the defendant acting alone, (2) the defendant and the defendant's own outlets and customers, and (3) the defendant and other major oil companies to eliminate the jobber market in order to restrain trade and create a monopoly in the retail sale of gasoline.

On January 17, 1974, this matter was transferred, pursuant to the provisions of 28 U.S.C. § 1404(a), from the Southern District of Ohio to this Court. Accordingly, the matter has proceeded through discovery and is now before the Court for a determination of the defendant's motion for summary judgment.

The defendant, in support of its motion for summary judgment, contends that the undisputed facts entitle it to a judgment as a matter of law. In particular, the defendant sets forth four major contentions in support of its position. First, the defendant asserts that the plaintiff cannot possibly establish a case warranting a favorable verdict because, as a matter of law, the facts establish that the plaintiff has not suffered a competitive injury to its business as a result of the allegations set forth in the complaint. In this regard, the defendant contends that the undisputed facts clearly establish that the plaintiff has continuously had available to it an alternate source of comparable products as a substitute for those previously supplied to it under the terminated jobber agreement. Second, the defendant claims that a section 1 violation can be established only if the challenged activity is shown to be the result of a conspiracy in restraint of trade. With re-

spect to this contention, the defendant asserts that the evidence demonstrates that it unilaterally decided not to renew the plaintiff's supply agreement for valid business reasons. Third, the defendant alleges that a section 2 violation can be found only if it is shown that the alleged monopolist possesses sufficient power to effect such a monopoly. Accordingly, the defendant asserts that its 6 per cent total of the North Carolina petroleum market is insufficient as a matter of law to support a judgment. Fourth, and finally, the defendant contends that the plaintiff has abandoned its section 14 claim thus entitling the defendant to summary judgment as to that claim. With respect to the abandoned claim, the plaintiff requests that it be allowed to submit to a voluntary dismissal without prejudice so as to continue to present this claim in another pending case.

In addition to the findings set forth above, the Court makes additional findings as follows:

## FINDINGS OF FACT

1. The plaintiff, Lee-Moore Oil Company, is a North Carolina corporation which is engaged in the business of buying and reselling petroleum products to customers, including retail service stations located within a 45–50 miles radius of Sanford, North Carolina.

2. The defendant, Union Oil Company of California, is a California corporation with its principal office in Los Angeles, California. Union transacts business in North Carolina and is primarily engaged in the business of producing and selling petroleum products.

3. The Court has jurisdiction over the parties and subject matter of this litigation.

4. The plaintiff corporation is a corporation comprised by the merger of four other companies prior to 1972. All four companies were "jobbers" engaged in the business of buying and selling petroleum products in the retail market.

5. In the early and mid-1960's, the four Proctor companies purchased petroleum products from various suppliers and resold those products to retail service stations and others. One of those four companies, Johnson Oil Company of Sanford, Inc., was supplied by Union. The other three companies were supplied by American Oil Company and Esso.

6. Johnson Oil Company, which later merged into Lee-Moore Oil Company, was supplied by the defendant on a year-to-year contract. This contract was subject to automatic renewal unless either party gave written notice to the contrary at least sixty days prior to the anniversary date of December 31.

7. In August of 1972, Union discussed the possibility that it would decline to renew its supply agreement with the plaintiff.

8. On September 27, 1972, the defendant gave written notice to the plaintiff of its intention not to renew the supply agreement after December 31, 1972.

9. Before the expiration date, the plaintiff informed the defendant of its need for a continuing supply for three of its retail service stations and one truck stop.

10. Subsequent to this request for a continued supply, the defendant agreed to supply the plaintiff with its needs for an additional six months.

11. On July 1, 1973, Union terminated completely its sales of petroleum products to Lee-Moore.

12. Four months later, in November of 1973, Union again offered a supply of petroleum products to the plaintiff pursuant to the mandatory allocation requirements of the Federal Energy Office.

13. The defendant continues, to this date, to offer the maximum volume of products permitted by those requirements to the plaintiff.

14. Immediately after receiving notice of the defendant's intention not to renew the supply agreement, the plaintiff began changing its branded stations to either American or an independent brand.

15. Since the termination of the supply agreement, the plaintiff has been able to obtain substantially more petroleum from other sources than that which had previously been supplied to it by Union.

16. Since the termination, the plaintiff has obtained in the market place over twice as much gasoline as it had acquired from the defendant prior to the termination.

17. The plaintiff has not been able to point to any evidence which would tend to show that it was not able to acquire at least as much petroleum after the termination as it had acquired prior to the termination.

18. The defendant has never sold any petroleum products directly to retail outlets served by the plaintiff.

19. Union has continued to utilize jobbers for distribution in North Carolina.

20. Union's sales in North Carolina comprised less than 6 per cent of the market in 1970 through 1974 and declined to less than 5 per cent by 1974.

21. There is no evidence to support the proposition that the plaintiff ever had to close a service station due to an insufficient supply of gasoline.

22. The plaintiff has lost, by the defendant's termination of the supply agreement, the right to use the Union brand name, and further, the right to honor Union credit cards. Moreover, the plaintiff has had to debrand all of its Union stations.

23. The parties have engaged in, and completed, a thorough and comprehensive period of discovery.

24. At the time of the termination of the supply agreement, the plaintiff had available to it an alternate source of comparable products from which it could acquire a substantial volume of gasoline.

## DISCUSSION

 Initially, the Court observes that in evaluating a motion for summary judgment, the moving party cannot shift the burden of producing evidence upon the non-moving party by simply filing a motion for summary judgment. That is to say, the plaintiff is entitled to rest on the allegations in his complaint until such time as the defendant has established that the facts are not as the plaintiff has alleged them to be, and further, the Court will presume that the plaintiff has evidence to support each of the allegations in its complaint until the moving party has established that the allegations are false. After such time as the defendant has presented sufficient evidence to rebut the plaintiff's case, it then becomes necessary for the plaintiff, in order to avoid the imposition of an adverse judgment, to come forward with some evidence to support its allegations. Otherwise, the Court would be justified in finding that there does not exist any genuine issues of fact for the jury and, therefore, the Court would be justified in entering a judgment for the defendant if these facts clearly indicate that it is entitled to a judgment.

 In applying the standards set forth above to a motion for summary judgment in an antitrust suit, the Court should be especially reluctant to grant a defendant's motion for summary judgment prior to giving the plaintiff an ample opportunity for discovery. This is particularly true in an antitrust action where the proof is largely in the hands of the alleged conspirators. *Apex Hosiery v. Leader,* 310 U.S. 469, 476, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). Therefore, summary judgment procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles in the plaintiff's case, *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), however, where the evidence clearly indicates that the defendant is entitled to summary judgment, the Court should not hesitate to allow the motion.

 The Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade or commerce, 15 U.S.C. § 1, or the monopolization of any part of trade or commerce. *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 743, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); 15 U.S.C. § 2. The antitrust laws were designed to prevent restraints to free competition in

business and commercial transactions, that is, restraints which tend to restrict production, raise prices, or otherwise control the market place to the detriment of the purchaser or consumers of goods and services. *Apex Hosiery, supra* 310 U.S. at 493, 60 S.Ct. 982.

In an effort to promote compliance with the provisions of the antitrust laws, and further, in order to protect the competitive position of private parties, Congress has provided a procedure whereby a private litigant may institute suit for any injury it may have sustained as a result of a violation of the antitrust laws. *Zenith Radio Corp. v. Hazeltine,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Accordingly, section 15, Title 15, U.S.C., provides, in part, that any person who has been injured in his business by reason of anything forbidden in the antitrust laws may sue the party responsible for the injury. Therefore, a private party is entitled to sue, when, as a consequence of the antitrust violation, his economic position is impaired. The fact of damage is satisfied by the proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. *Zenith, supra* at 114 n. 9, 89 S.Ct. 1562. Moreover, the damage from which the plaintiff complains need not be demonstrated with absolute certainty, rather, all that is necessary is that the plaintiff establish that in the absence of the anticompetitive practice he would not have suffered the loss asserted. *M. C. Mfg. Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1064 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).

### Injury to the Plaintiff

At the outset, the defendant contends that it is entitled to summary judgment on the ground that the undisputed facts clearly indicate that the plaintiff has not sustained an injury as a result of the defendant's alleged violations of the antitrust laws. The defendant's argument in support of this contention is two-prong: First, the defendant asserts that the availability to Lee-Moore of a comparable alternative supply of petroleum products preclude the existence of any injury or impact to the plaintiff's business and, therefore, that the defendant is not liable to the plaintiff for the alleged antitrust violations; secondly, the defendant claims that the evidence establishes that the plaintiff has always had an adequate supply of petroleum products from alternate sources sufficient to conduct its business inasmuch as the plaintiff's profits have increased since the termination of its supply agreement. Moreover, the defendant asserts that the plaintiff's new suppliers adequately insure that the plaintiff will have a continuing supply of gasoline in the years to come.

In response to the defendant's assertion that it has not suffered a competitive injury to its business due to the termination of the supply contract, the plaintiff asserts that it has alleged a sufficient injury to maintain this action, and further, the plaintiff asserts that the defendant has not sufficiently rebutted this fact so as to entitle it to summary judgment. In support of its claim of damage, the plaintiff asserts that it has sustained a loss by reason of the increased price it must now pay for its gasoline from new suppliers. Additionally, the plaintiff contends that it has been injured by the expenditures it has had to make with respect to debranding its Union stations, the financing cost on loans from Union for closed Union stations, the closing of Union stations due to its inability to find station operators for unbranded stations, the loss of jobber co-op advertising assistance, the loss of sales to Union credit card customers through the loss of its credit card privileges, the loss of customer goodwill, and the loss of its margin on unbranded sales following the restoration of some of its Union supply. Moreover, the plaintiff asserts that it engaged in an expansion program in 1971 and 1972 in reliance on its existing sources of supply and, therefore, that it has been damaged by a short supply of Union gas to supply these additional Union branded stations. The plaintiff further asserts that it has had to close several of its Union branded stations because it was unable to supply

Union gas. In this regard, the plaintiff claims that it has made contracts and commitments to stations for Union products, the Union brand, Union credit card service and Union advertising. Additionally, the plaintiff asserts that it has had difficulties finding new jobberships, and further, that it has had trouble finding new brands for its Union stations.

In opposition to the plaintiff's position with regard to the damage issue, the defendant contends that the damages set forth by the plaintiff are legally insufficient to establish a claim in an antitrust case based upon the termination of a supply agreement—a refusal to deal. With regard to this contention, the defendant further asserts, by way of explanation, that the damages alleged by the plaintiff are the result of a legally permissible termination of a supply agreement and not the result of any alleged violation of the law.

■■■ The Court observes that a manufacturer or supplier has a right to sell its goods to anyone, for any reason sufficient to itself without incurring liability under the antitrust laws. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade, such as price fixing, the elimination of competition, or the creation of a monopoly. Accordingly, a mere refusal to deal, without more, is insufficient as a matter of law to sustain liability against a defendant under the Sherman Act. *United States v. Parke Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Garrett's Inc. v. Farah Mfg. Co., Inc.*, 412 F.Supp. 656, 664 (D.S.C.1976). Therefore, a refusal to deal can rise to the level of a violation of the antitrust laws only when the refusal is based on an unreasonable restraint of trade or an attempt to eliminate competition. However, since the present case involves a private action under the antitrust laws, a refusal to deal coupled with the necessary invidious objective is not enough. In addition to establishing a refusal to deal and an unlawful goal, the plaintiff must also establish that it has been injured by the aforementioned acts. 15 U.S.C. § 15. Accordingly, even if the plaintiff can establish that the defendant has refused to deal with it, and further, that this refusal is part of a scheme to violate the antitrust laws, it cannot, as a matter of law, recover unless it can also establish that it has suffered a competitive injury as a consequence of the substantive violation. *Zenith, supra.*

■■■ As often stated, any damage, however minimal, is sufficient to establish standing to maintain a private action under the antitrust laws. *Zenith, supra; Texas Foundaries, supra.* However, not just any type of damage will be sufficient to establish a case for recovery, rather, it is absolutely essential for the plaintiff to establish a "competitive injury" to its business. This is so because the antitrust laws are directed towards eliminating restraints upon competition or an individual's competitive position in the marketplace. Accordingly, it is necessary to differentiate between those damages which result from having to shift to a new source of supply (a consequence of any innocent or lawful refusal to deal), and those damages which arise from a party's anticompetitive practices. Therefore, in evaluating the nature of the plaintiff's injury, the Court must focus on the competitive nature of the damages asserted.

■■■ In determining whether the plaintiff has incurred some damage to his business sufficient to maintain this private action under the antitrust laws, the Court must ascertain whether the plaintiff has suffered a competitive injury to its business. *GAF Corp. v. Circle Floor Co., Inc.*, 463 F.2d 752 (2nd Cir. 1972), *cert. dismissed*, 412 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). Although the plaintiff's mere presence within the "target area" of the alleged anticompetitive activity may be sufficient to provide standing to sue, *South Carolina Council of Milk Producers v. Newton*, 360 F.2d 414 (4th Cir. 1966), *cert. denied*, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966), in order to recover on the merits, the plaintiff must be able to establish an injury to its competitive position in the business in

which it was engaged. *GAF Corp., supra* at 758.

■ In applying the "competitive injury" rule in an antitrust case involving a refusal to deal, it has been held that where there is an available comparable alternative source of supply to the plaintiff for the terminated commodity, the plaintiff is barred from asserting a claim against its old supplier for a violation of the antitrust laws. *Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.*, 459 F.2d 138, 148 (6th Cir. 1972). In this regard, the burden is on the plaintiff to establish that comparable alternative brands were not available. Accordingly, the plaintiff must establish, as an essential element to recovery, the fact of damage because of exclusion from a specified source of supply and the lack of an alternative substitute for the desired product. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 381, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). An adverse effect upon the buyer's business is not sufficient to constitute liability, *Ace Beer Distributors Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir. 1963), for the plaintiff must also establish that the adverse effect was the result of an exclusion from the market for its desired product. Therefore, where there are market alternatives that the plaintiff may readily use for its purposes, it has not sustained any damage by the otherwise valid termination of its supply agreement with the defendant. *Wisdom Rubber Industries v. Johns-Manville Sales*, 415 F.Supp. 363, 366 (D.Haw.1976).

■ Now, focusing on the facts in this particular case, the Court concludes that the defendant has established that the undisputed facts show that the plaintiff had an available alternate supply from which it could acquire its supply of petroleum products. Accordingly, the Court concludes that the plaintiff has not suffered a competitive injury to its business as a result of the defendant's termination of its supply agreement.

On September 27, 1972, the defendant gave written notice to the plaintiff of its intention not to renew the jobber agreement on the next upcoming anniversary date of December 31, 1972. However, rather than terminating the plaintiff's supply at the end of the year, the defendant, at the plaintiff's request, extended the plaintiff's supply for an additional six months. Immediately after the final termination, the plaintiff began changing over to other suppliers. With little or no break in its supply, the plaintiff was able to cover the defendant's prior supply quota, and further, the plaintiff was able to increase its volume by acquisitions from nine or ten new suppliers. Within four months after the termination, the plaintiff was able to again obtain fuel from the defendant pursuant to the mandatory allocation requirements of the Federal Energy Office.

Since December 31, 1972, the plaintiff has been able to expand its sales from less than 11,000,000 gallons in 1972 to more than 27,000,000 gallons in 1975. These figures alone would tend to indicate that the plaintiff had an abundant supply from alternate sources. However, in addition to this marked increase in the plaintiff's volume of sales, there is the absence of any statement in the plaintiff's own material in opposition to the defendant's motion for summary judgment to the effect that it could not find an alternate supply of gasoline. In fact, the evidence presented by the defendant affirmatively shows that the plaintiff was able to purchase large quantities of gasoline from several major petroleum suppliers and numerous other small suppliers.

The plaintiff has pointed out numerous areas in which it has been forced to expend money, or has lost money, due to the defendant's termination of its supply agreement. These areas include, but are not limited to, losses resulting from lost use of Union's credit cards, debranding its Union stations, lost advertising, loss of price margins, cost associated with finding a new brand, loan fees on Union stations, increased prices, the closing of stations due to the inability to find an operator who would operate an unbranded station and loss of customer goodwill. However, the defect in this proposition of damage is that these

costs resulted from the termination of the supply agreement and not from the unavailability of gasoline.

Anytime a business is forced to change suppliers or brand names, it is going to incur some of these costs. These expenses resulted from the plaintiff's failure to secure a long-term supply contract with the defendant. There are no allegations to the effect that the defendant forced a year-to-year agreement on the plaintiff or that the defendant used the year-to-year contract as a device to lure the plaintiff into an untenable position. In short, these damages could result from even the lawful termination of a supply agreement.

To further support its position that it has suffered a competitive injury to its business, the plaintiff states that for a relatively short period of time an alternative source of supply was not available. However, there is simply no support in the record for this position. Even if there was support for this assertion, which the Court does not so find, it would be virtually impossible to imagine how any business could effectuate a perfect transition between suppliers without some slight diminishing of its supply.

In an attempt to bolster its position that there was an insufficient source of supply of an alternate product, the plaintiff has argued that it has had to close some of its Union stations, and further, that it has expanded its number of Union stations in reliance on a continued supply of Union gas. The Court finds no merit in this position. The plaintiff's reliance on a continued supply of Union gas was obviously a mistake in judgment when viewed with the fact that the supply agreement with Union was terminable at the will of either party. The plaintiff gambled and lost. As for having to close a few of its Union stations, this was the natural consequence of having lost its supply of Union gas, and further, its inability to find operators who would maintain an unbranded station. Neither of these problems resulted from an insufficient supply of alternate sources of gasoline.

The plaintiff contends that its inability to find another source of branded gas (a problem which seemingly existed for only a brief time) establishes that there was not an available alternative source of supply. In this regard, the plaintiff equates comparable source to mean a source of a comparable brand. However, this position is also untenable. The plaintiff is in the jobber business of selling gas to retail outlets. The fact that it may have unilaterally decided to promote the growth of Union stations thus increasing its ability to sell more Union gas does not have any bearing on the availability of the product in which it deals; that is, the sale of gasoline to retail outlets.

While it may be true that the plaintiff suffered a substantial amount of damage as a result of a shortage of Union gasoline, the record is clear that these damages did not result from the unavailability of some kind of gasoline. The supply was available for the plaintiff to purchase and the record reflects that an abundant number of purchases were made. Had the plaintiff secured a long-term supply contract with the defendant, it would not have had a problem. Having limited itself to a year-to-year agreement, the defendant has placed itself in the position of having to change to another brand of gasoline—hence, the need for new signs and operators.

By way of summary, the only injury the plaintiff has suffered arises solely from its inability to purchase Union gasoline—not from its inability to purchase a comparable alternative type of gasoline.

In conclusion, the Court observes that the result achieved in this case is not unduly harsh, nor is it the result of an overly restrictive application of the "competitive injury" rule. The antitrust laws are designed to protect free enterprise and promote competition. In the present case, the availability of an alternate source of comparable gasoline precludes a finding that the plaintiff has sustained a competitive injury to its business. The free enterprise system provided the plaintiff with a supply of gasoline, and further, a competitive market provided for the influx of large and small oil producers into the plaintiff's area of business.

### Other Grounds Supporting Summary Judgment

In support of its motion for summary judgment, the defendant has presented three additional arguments which it asserts support the entry of a judgment in its favor. The Court has examined these contentions and the parties' positions with respect to them. Although the Court believes that there is merit to each of these positions, the Court is unable, at this time, to conclude that the defendant is entitled to a judgment as a matter of law on the basis of these additional contentions. Accordingly, the Court declines to grant summary judgment on the basis of these various contentions.

### Plaintiff's Motion for a Dismissal Without Prejudice

In the present action, the plaintiff has set forth allegations concerning the defendant's refusal to continue to sell gasoline to it pursuant to a supply agreement. The thrust of the plaintiff's complaint was directed towards the alleged anticompetitive effect of this refusal to deal. However, as is sometimes the case, the plaintiff alleged that this refusal to deal constituted a wide-ranging violation of many different provisions of the antitrust laws. In this regard, the plaintiff alleged, in a conclusory fashion, that the defendant's refusal to deal constituted a violation of the Clayton Act, 15 U.S.C. § 14. However, early in the course of this suit, the plaintiff abandoned its Clayton Act claim and so stated this to the defendant in an answer to one of the defendant's interrogatories. The plaintiff now wishes to obtain the voluntary dismissal without prejudice to the Clayton Act claim.

■ The basic purpose of Rule 41(a)(2) is to freely permit the plaintiff, with court approval, to voluntarily dismiss an action so long as no other party will be prejudiced. The plaintiff's right to a voluntary dismissal without prejudice is not absolute. Rather, dismissal on motion under Rule 41(a)(2) is within the sound discretion of the trial court.

■ When considering a dismissal without prejudice, the Court should keep in mind the interest of the defendant. Nevertheless, in most cases a dismissal should be granted unless the defendant will suffer some legal harm. However, the mere prospect of a second lawsuit is not sufficient to tip the scales in favor of a dismissal with prejudice. *LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 604 (5th Cir. 1976).

In the present case, the Court is unable to see how the defendant will suffer any substantial prejudice by the allowance of this motion. The plaintiff abandoned its Clayton Act claim shortly after the institution of this action. The defendant's motion for summary judgment does not really address the issues involved in the Clayton Act claim, rather, it demands judgment as to that claim solely because the plaintiff has abandoned it. Additionally, it does not appear that there will be any duplication in discovery should the Court allow the plaintiff to present its Clayton claim in another suit. In sum, the Court cannot perceive how the defendant will suffer any legal prejudice by the granting of this motion.

■ In addition to the reasons set forth above, the Court is reluctant to foreclose a proper determination of the plaintiff's Clayton Act claim inasmuch as the Court is unaware of the factual basis for that claim, and further, what merit, if any, there may be in the claim. In passing, however, the Court observes that while the action taken on the merits of the present suit may not be res judicata on the plaintiff's Clayton Act suit, that the "no injury" determination heretofore discussed may indeed have some collateral effect on the claim the plaintiff now wishes to have dismissed without prejudice. In any event, the Court concludes that the plaintiff's motion should be allowed.

Therefore, it is concluded that the plaintiff's motion to voluntarily dismiss its section 3, Clayton Act, 15 U.S.C. § 14, claim without prejudice is allowed. Further, it is concluded that the defendant's motion for summary judgment, as it relates to the plaintiff's section 1 and section 2 claims, 15 U.S.C. §§ 1 and 2, is allowed.

The defendant will prepare a judgment in conformity with this opinion and submit it to the plaintiff for approval as to form and delivery to the Court.