**LEE–MOORE OIL COMPANY,**
Appellant,

v.

**UNION OIL COMPANY OF CALIFORNIA, Appellee.**

**LEE–MOORE OIL COMPANY, Appellee,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Appellant.**

Nos. 78–1208, 78–1209.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1979.

Decided May 21, 1979.

Irving I. Saul, Dayton, Ohio (Robert S. Hodgman, Lawrence Egerton, Jr., Greensboro, N. C., on brief), for appellant in 78–1208 and for appellee in 78–1209.

G. David Schiering, Cincinnati, Ohio (William H. Blessing, Taft, Stettinius & Hollister, Cincinnati, Ohio, Bynum M. Hunter, Michael E. Kelly, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellee in 78–1208 and for appellant in 78–1209.

Before WINTER, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

WINTER, Circuit Judge:

After defendant Union Oil Company of California (Union) terminated its supply contract with plaintiff Lee-Moore Oil Company (Lee-Moore), Lee-Moore brought this private antitrust action under § 4 of the Clayton Act, 15 U.S.C. § 15.[1] The district court granted Union's motion for summary judgment on the ground that Lee-Moore's evidence failed to show that it had suffered any damages compensable under the antitrust laws. We disagree. We think that Lee-Moore's evidence shows injury which, if proved to have been caused by an antitrust violation, would be recoverable under § 4. We therefore reverse and remand for further proceedings.

## I.

The relevant background facts are not in dispute. Lee-Moore was formed as a result of a merger in 1972 of four companies which had been "jobbers" in petroleum products—*i. e.*, distributors who purchased gasoline and other petroleum products from oil suppliers and sold them to retail gas stations. One of the four companies, Johnson Oil Company of Sanford, Inc., purchased products from Union under a contract which automatically renewed itself annually unless either party gave written notice of cancellation at least sixty days prior to the anniversary date. Johnson, in turn, sold these products to retail outlets in North Carolina which operated under the Union brand name.

On September 27, 1972, Union gave timely notice of cancellation of its contract with Johnson (now Lee-Moore), effective December 31, 1972. As a result, Lee-Moore was unable to supply Union-branded products to its customers that operated retail stations

---

1. Section 4 provides in pertinent part:
 Any person who shall be injured in his business or property by reason of anything for-

bidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . .

under the Union brand name.[2] Its evidence shows that it sought alternative sources of supply among the major oil companies, with little success. Amoco was willing to supply a limited amount, but only for resale to a few specified retail stations, since the area was already almost saturated with Amoco-branded stations. The other major oil companies which Lee-Moore contacted refused to supply Lee-Moore under a jobber contract. Thus, except for the few stations which it could supply with Amoco products, Lee-Moore could offer its retail stations only the unbranded products of independent suppliers. In November 1973, Union resumed sales to Lee-Moore as required by the mandatory allocation program of the Federal Energy Office, and since then it has supplied Lee-Moore with the maximum amount permitted under that program. All products so supplied by Union, however, do not carry the Union brand and can therefore be resold by Lee-Moore only to its stations that have switched to independent brand names.

Lee-Moore brought this antitrust action, alleging that the cancellation of the contract was a violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.[3] Lee-Moore alleges a conspiracy among the major oil producers, including Union, to create an artificial oil shortage in early 1973 (well before the Arab oil embargo which occurred later in that year). The shortage was allegedly contrived by the producers' intentional failure to take advantage of federal regulations permitting an increase in oil imports. Lee-Moore contends that one of the goals of this conspiracy was to drive from the market maverick jobbers, such as Lee-Moore, which, through their promotion of fiercely competitive self-service retail stations, tended to depress the price of major brand products.[4] Union's cancellation of its contract with Lee-Moore was alleged-

ly a part of or in furtherance of this conspiracy. While the termination of a supply contract under proper circumstances is not forbidden by the antitrust laws, it is undisputed that a cancellation in the context of the alleged anticompetitive conspiracy would constitute a *per se* Sherman Act violation. *See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Lee-Moore's evidence shows various hardships that resulted from the contract termination. It incurred expenses in seeking new contracts with other major oil producers and in helping its retail station customers in switching from the Union brand to Amoco or to an independent brand. Lee-Moore further claims that when it was forced to purchase gasoline from Amoco or independent producers, it paid at least one cent, and at times from five to twenty cents, more per gallon than the current price of Union gasoline. Moreover, those stations that switched to independent brands lost the advantages of Union goodwill, including Union advertising and the use of Union credit cards. Finally, Lee-Moore alleges that certain retail service stations which had purchased Union products from Lee-Moore were unwilling to switch to an independent brand, and they stopped making any purchases from Lee-Moore. Despite these claimed hardships, Lee-Moore has prospered; both its sales and its profits have increased since cancellation of the Union contract.

In granting summary judgment for Union, the district court held that Lee-Moore had not shown any damages recoverable under § 4. 441 F.Supp. 730 (M.D.N.C.1977). This holding appeared to have two separate bases. First, the court ruled that any injury suffered by Lee-Moore was not "competitive injury," because at all times Lee-

---

**2.** With respect to four of Lee-Moore's retail station customers, Union continued to supply products to Lee-Moore until July 1, 1973.

**3.** A further claim that Union had violated Clayton Act § 3, 15 U.S.C. § 14, was dismissed without prejudice at Lee-Moore's request.

**4.** Much of the theory and statistical data underlying Lee-Moore's conspiracy allegations is based on the research of Fred C. Allvine, whom it intends to call as an expert witness at trial. *See* F. Allvine & J. Patterson, *Highway Robbery: An Analysis of the Gasoline Crisis* (1974).

Moore had available to it alternative sources of supply for gasoline and other products. Second, the court noted that Lee-Moore would have sustained the same damages if Union had lawfully cancelled its supply contract, and it therefore concluded that Lee-Moore could not recover these damages even if it showed that the cancellation was in furtherance of an illegal conspiracy.

## II.

■ We treat the district court's bases of decision in inverse order. The district court's ruling with regard to the identity of damages was as follows:

> Anytime a business is forced to change suppliers or brand names, it is going to incur some of these costs. These expenses resulted from the plaintiff's failure to secure a long-term supply contract with the defendant. There are no allegations to the effect that the defendant forced a year-to-year agreement on the plaintiff or that the defendant used the year-to-year contract as a device to lure the plaintiff into an untenable position. In short, these damages could result from even the lawful termination of a supply agreement.

*Id.* at 739.

This reasoning is based on what we think is an erroneous view of private damage actions under § 4. If Lee-Moore can show damages caused by Union's antitrust violation, the fact that Union might have caused the same damages by a lawful cancellation of the contract is irrelevant. It is, of course, an established principle that a supplier may lawfully refuse to deal with a customer, so long as the refusal does not involve an illegal combination or agreement. *See, e. g., United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63

L.Ed. 992 (1919). But we fail to understand how this principle can limit a plaintiff's right of recovery under § 4 once a Sherman Act violation is established. The reports contain a multitude of cases in which private recovery for an unlawful refusal to deal has been or will be allowed with regard to elements of damage, which, had the refusal to deal been lawful, would not have been recoverable.[5]

## III.

The other basis of the district court's holding, that Lee-Moore had failed to show any "competitive injury," requires more detailed discussion. The notion that certain damages, while proximately caused by an act in violation of the antitrust laws, may still not be recoverable because they do not constitute "competitive" or "antitrust" injury has not been clearly developed in the lower federal courts. The Supreme Court, however, recently denied a § 4 recovery on this basis in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). We therefore consider *Brunswick.*

Brunswick, a large manufacturer of bowling equipment and operator of bowling centers, acquired the assets of some bowling centers that had defaulted on payments for purchases of Brunswick equipment. When Brunswick continued to operate the bowling centers it had acquired, competing bowling centers brought suit, alleging a violation of § 7 of the Clayton Act, 15 U.S.C. § 18. The lower courts found that Brunswick's actions could constitute a § 7 violation under the "deep pocket" theory, and the correctness of this holding was not questioned before the Supreme Court. Rather, the issue before the Supreme Court was the recoverability of damages under § 4. The only injury that the plaintiffs were able to show was the denial of an anticipated increase in market shares which would have resulted if the defaulting bowling centers had been closed down.

5. *See, e. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.,* 539 F.2d 907 (2 Cir. 1976); *Osborn v. Sinclair Refining Co.,* 324 F.2d 566 (4 Cir. 1963); *Richfield Oil Corp. v. Karseal Corp.,* 271 F.2d 709 (9 Cir. 1959), *cert. denied,* 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960).

The Supreme Court held that such damages were not recoverable. The Court stated:

> We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazletine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

429 U.S. at 489, 97 S.Ct. at 697 (emphasis by the Court).

We think that there is little reason to believe that this unanimous holding of the Court was intended to announce a radical revision of the law of private antitrust damage actions. As the Court noted, the purpose of § 7 is to prevent dangerous increases in market concentration, but the plaintiffs in *Brunswick* were seeking to recover for injury caused by action which had the effect of averting such an increase.

> [T]he antitrust laws are not merely indifferent to the injury claimed here. At base, [plaintiffs] complain that by acquiring the failing centers [Brunswick] *preserved competition*, thereby depriving [plaintiffs] of the benefits of increased concentration. . . . It is *inimical to the purposes of these laws* to award damages for the type of injury claimed here.

*Id.* at 488, 97 S.Ct. at 697 (emphasis added). The anomalous claim of plaintiffs thus presented a compelling case for denying recovery.[6]

Before turning to the instant case, we note two other aspects of *Brunswick* that merit comment. First, it is noteworthy that *Brunwsick* involved a violation of § 7 of the Clayton Act. While the rationale of *Brunswick* is not limited to § 7 cases, it may not be as readily applicable in cases which, like the case now before us, charge *per se* violations of the Sherman Act.[7] Section 7 condemns mergers and acquisitions which may have merely the potential of substantially lessening competition, even though no actual effect on competition has yet been manifested. *See, e. g., United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). Cases are thus likely to arise under § 7 in which competitive injury to the private plaintiff has not occurred.[8]

By contrast, the case will be quite rare in which a *per se* violation of the Sherman Act does not cause competitive injury. The Supreme Court has condemned as *per se* violations "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). A § 4 plaintiff charging a *per se* violation must still prove injury, of course, but it is unlikely that such injury will fail to qualify as "antitrust injury" under *Brunswick* when it is caused by "conduct that is manifestly anticompetitive," *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Indeed, a leading com-

---

**6.** This anomalous claim of injury has led one commentator to suggest that it was inconsistent with the claim that § 7 had been violated at all. Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127, 1132 n.34 (1976).

**7.** "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *see Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**8.** *See* Areeda, *supra* note 6, at 1128–36.

mentator on federal antitrust laws takes the position that a non-conspiratorial competitor who is likely to be the beneficiary of a *per se* violation has not sustained antitrust injury and thus cannot complain of the offender's conduct, but "[t]he victims of a section 1 conspiracy, typically the direct purchasers of the overcharged product or potential buyers from the boycotting defendants, have standing and can properly claim that they have suffered antitrust injury." Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 993–94 (1977).

A second significant aspect of *Brunswick* is that the Court was careful to state that a plaintiff need not prove that competition has actually been diminished in order to show "antitrust injury":

> [The Court's holding] does not necessarily mean . . . that § 4 plaintiffs must prove an actual lessening of competition in order to recover. . . . [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened. Of course, the case for relief will be strongest where competition has been diminished.

429 U.S. at 489 n.14, 97 S.Ct. at 698.

### IV.

With these principles in mind, we proceed to consider the deficiencies in Lee-Moore's claims of damages urged by Union and found by the district court. Lee-Moore alleges a great variety of damages falling basically into three groups: (1) loss of profits due to lower sales, (2) payment of higher prices for alternative supplies, and (3) costs in finding alternative supplies.

1. Lee-Moore claims that as a result of the contract termination, its sales were lower than they otherwise would have been, and it seeks to recover the profit that it would have realized from these lost sales. Apparently the largest factor contributing to the loss of sales was Amoco's inability or unwillingness to supply gas to all of Lee-Moore's retail outlets, coupled with the re-fusal of certain retail gas stations, which had previously dealt with Lee-Moore, to accept independent suppliers' products and to switch from the Union brand to an independent brand. Additionally, Lee-Moore claims that those retail stations which were willing to switch to an independent brand suffered a loss of consumer sales and consequently purchased less gasoline from Lee-Moore.

We hold that these damages, if proved, are recoverable under § 4. "In many, if not most, private antitrust actions, the principal element of damage is precisely what we are now considering—the loss of profits caused by a refusal to deal." *Osborn v. Sinclair Refining Co.*, 324 F.2d 566, 572 (4 Cir. 1963); *see, e. g., Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Concerted refusals to deal are condemned by the antitrust laws because their purpose and effect is to reduce competition by driving the plaintiff from the market.

In the instant case, Union's action, allegedly in furtherance of a conspiracy among the major oil producers, deprived Lee-Moore of the opportunity to deal in major brand gasoline (except with respect to a few retail outlets which Amoco was willing to supply) and forced Lee-Moore to deal in independent brands. This is quite unlike the claim of damages in *Brunswick*, where plaintiffs sought the extra profits that they would have gained from a decrease in competition. Rather, Lee-Moore's loss was precisely "the type of loss that the claimed violations . . . would be likely to cause." 429 U.S. at 489, 97 S.Ct. at 697. The fact that Union's action did not drive Lee-Moore wholly from the gasoline market is insignificant, since, as the Supreme Court made clear in *Brunwsick*, a plaintiff need not prove an actual lessening of competition in order to show "antitrust injury."

Union contends that Lee-Moore cannot claim lost profits, since its profits have actually increased since the contract termination. This argument misperceives the nature of Lee-Moore's claim. The claim is not for the difference between profits made

before and after the cancellation. Rather, it is for the difference between profits actually made after the cancellation and those increased profits that would have been made in that same period but for the unlawful cancellation.[9]

> The "injury" in the typical antitrust case is . . . *relative* in nature. No matter how thriving his business may be, no matter how large his rate of profit may be, no matter how impressive his annual report may be, the substance of his claim is that he would have been even *better off* if the defendant's alleged misdeeds had never taken place.

Pollock, The "Injury" and "Causation" Elements of a Treble-Damage Antitrust Action, 57 Nw.U.L.Rev. 691, 694–95 (1963) (emphasis in original); *see, e. g., A. C. Becken Co. v. Gemex Corp.*, 272 F.2d 1, 4–5 (7 Cir. 1959). If plaintiffs in Lee-Moore's position were precluded from recovering their relative loss of profits, then an antitrust violator in a market experiencing an increase in consumer demand could avoid § 4 liability while unlawfully capturing all profits resulting from this increasing demand, so long as his competitors did not suffer an absolute decrease in profits from one year to the next.[10]

■ Union further contends that Lee-Moore did not suffer any competitive injury because it had available a "comparable product" in the form of independent-brand gasoline. We fail to see how the independent brands can be labeled "comparable" products for the purpose of measuring Lee-Moore's injury, when a switch by Lee-Moore to such independent brands allegedly resulted in customer defections and decreased sales.

Union cites the decision in *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.*, 459 F.2d 138 (6 Cir. 1972), in which a department store sought § 4 damages for an alleged conspiracy to prevent it from selling certain brands of merchandise. The Sixth Circuit, reversing a judgment for plaintiff, stated that the plaintiff was able to sell other brands of merchandise and had not shown that its profits from the sale of these alternative brands were any lower than the profits it would have received from sale of the brands involved in the conspiracy. *Elder-Beerman* thus does not hold that the availability of alternative brands automatically bars § 4 recovery in a case of unlawful refusal to deal. Rather, it stands for the uncontroversial principle that a § 4 plaintiff, like any other, must prove actual injury in order to recover. Lee-Moore's evidence, adduced to defeat the motion for summary judgment, indicates that Lee-Moore may be able to prove actual injury caused by dealing in independent brands rather than Union products. We think that it should have the opportunity to present its proof at trial.

■ 2. Lee-Moore alleges that after the contract termination, the alternative brands of gasoline which it purchased from Amoco or independent suppliers sold for a price higher than the contemporaneous price of

---

**9.** It is, of course, possible that because of limited supplies and federal regulation, Lee-Moore could not have sold more gasoline than it actually did, even if Union had not terminated the contract. But this fact has not yet been developed in the record. It cannot be relied on to support summary judgment.

**10.** Union cites the decision in *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2 Cir. 1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973), in which it was alleged that defendant, as part of an unlawful scheme to gain control of plaintiff corporation, stopped purchasing supplies from plaintiff. Finding plaintiff's evidence of injury insufficient, the Second Circuit denied recovery on the charge of an unlawful refusal to deal. The court found

that plaintiff's evidence failed to rule out the possibility that other customers stepped in to purchase the supplies that defendant had refused to purchase. In this context, the court stated: "We fail to perceive how [plaintiff] could have lost any profits if customers purchased the same quantity in one year as in a previous year, although the identity of the purchasers changed." *Id.* at 759. We have no doubt that this quoted statement from the court's opinion carries the unstated assumption of "all other things being equal." Surely if the plaintiff in *GAF* had been able to show that its profits remained stable at a time when, but for defendant's unlawful acts, they would have increased, the Second Circuit would have not denied recovery on this ground.

Union gasoline by one to twenty cents per gallon. Lee-Moore seeks to recover as damages the difference between the price actually paid for the alternative brands and the lower price it would have paid for Union gasoline under the contract.

We hold that these damages, if proved, are recoverable under § 4.[11] Recovery of damages of this sort was approved by the Supreme Court in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). There, the plaintiff claimed as damages the difference between the amount of equipment rentals actually paid to defendant and the lower amount that plaintiff would have paid for using the equipment but for defendant's antitrust violation. The Court held that "when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." *Id.* at 489, 88 S.Ct. at 2229. We see no difference in principle between the *Hanover Shoe* situation, in which the defendant, through its antitrust violations, exacts a higher price from the plaintiff than plaintiff would otherwise pay, and the situation in the instant case, in which Union, by unlawfully refusing to deal with Lee-Moore, has forced it to purchase alternative products elsewhere at a higher price.

In response to this claim of damages, Union again argues that Lee-Moore suffered no competitive injury from the contract cancellation because an alternative supply of "comparable" products was available. Union cites *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290 (7 Cir. 1974), in which the defendant was charged with monopolization or an attempt to monopolize, as a case supporting its argument. In defining the relevant market, the Seventh Circuit rejected plaintiff's effort to exclude certain competing brands which sold at a higher price. That holding is inapposite to the issue before us. The discussion in *Mullis* was directed to whether plaintiff had established a case of an attempt to monopolize in violation of § 2 of the Sherman Act. In the instant case, antitrust liability is asserted on a theory of conspiracy (an issue not reached by the district court or by us); but what is more important, we and the district court are concerned whether defendant suffered antitrust injury if it is assumed that there is antitrust liability. In the instant case, antitrust liability is not presently an issue before us. Thus, the fact that higher-priced brands may be included in the relevant market has no bearing on the calculation of damages suffered by Lee-Moore as a consequence of its being compelled to buy the higher-priced brands.

 3. Because Lee-Moore's retail outlets were forbidden to sell products under the Union brand name after the contract was terminated, Lee-Moore incurred substantial administrative expenses in seeking new suppliers and in assisting the retail outlets in switching from Union-brand insignia to Amoco or independent brands. These expenses, if proved, may properly be included in the calculation of damages under § 4. A plaintiff may recover for costs incurred in mitigating the anticompetitive effects of defendant's antitrust violation. *See, e. g., Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 69 (4 Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

With respect to all of Lee-Moore's damage claims, we stress that our holding goes no further than to reverse the summary judgment in favor of Union. Lee-Moore, like any antitrust plaintiff, may recover under § 4 only if it sustains its burden at trial of proving the alleged antitrust violation, the fact of injury, the requisite causal relationship between violation and injury, and the amount of damages. *See generally Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Pollock, *supra*, at 692. We further note

---

**11.** To the extent that these higher prices were paid for gasoline purchased in the "spot" market, where higher prices normally prevail, Lee-Moore must show that such "spot" market purchases would not have been necessary but for Union's unlawful acts.

that we have no occasion at this stage in the proceedings to consider the extent to which Lee-Moore's various claims of damage may overlap or involve double counting.

## V.

As an alternate ground for granting summary judgment, Union contended before the district court that Lee-Moore's evidence failed to raise a genuine issue of the existence of a conspiracy under the Sherman Act, and Union renews this contention before us as an alternate ground for affirmance. Because the district court granted summary judgment on the issue of competitive injury, it did not pass on the merits of Union's alternate contention. Mindful of this fact and of the Supreme Court's admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), we decline to pass upon this issue in the first instance.

*REVERSED.*

WIDENER, Circuit Judge, concurring and dissenting:

I concur in parts I, II, and V of the opinion of the majority. It is with respect to parts III and IV that I have some disagreement.

While I agree that this case should be remanded, I do so only because I do not think the only conclusion which could have been drawn from the record is that Lee-Moore could not reasonably have been expected to show a greater profit had Union not failed to renew its dealership agreement. I doubt very much the plaintiff can present such proof, but the record is not conclusive on this point and all inferences should be drawn in favor of the party against whom summary judgment is entered. I would remand to ascertain first the narrow point of whether or not there were lost profits due to dealing in a different brand, so as to the extent of the remand I respectfully dissent. Only if that hurdle were overcome, should additional evidence on the cause of action be permitted.

In order to show an antitrust injury, as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976), a plaintiff must show injury to his competitive position in the market. "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[1] The record shows that plaintiff had a more than adequate supply of gasoline since termination of its contract. In fact, in 1973 plaintiff received 2,067,087 gallons more gasoline than in 1972, and 740,237 more gallons of major oil company gasoline.[2] The 1974 and 1975 figures show an even more dramatic increase with purchases of 18,535,775 gallons in 1974 and 26,929,920 in 1975. In addition, gross receipts have increased substantially in every year since contract termination; and 1975 net income was more than 250 percent greater than

---

1. The majority goes to some length to limit *Brunswick* to its admittedly unusual facts. However, § 4 has been in effect since 1914, and I do not think its requirements are properly so drastically narrowed as the majority indicates. The passage I have quoted from *Brunswick* I think is the generally accepted construction of § 4 and is the key around which this case should be decided when taken in conjunction with the lost profits theory as set forth in the majority opinion.

2. As the table below indicates, in 1973 Lee-Moore (after merger with Johnson) received 740,137 more gallons of major oil company gasoline than Lee-Moore and Johnson combined purchased in 1972. Additionally, its overall supply from all sources increased by 2,067,087 gallons.

Combined Lee-Moore and Johnson
Purchases 1972–1973

| Year | Supplier | Purchases |
|------|----------|-----------|
| 1973 | American (LM/J) | 10,150,528 |
| | Union (LM/J) | 639,333 |
| | Others (LM/J) | 2,807,689 |
| 1972 | American (LM) | 5,871,353 |
| | Union (J) | 4,198,371 |
| | Others | 1,480,739 |

that for 1972.[3] Unfortunately, the record does not show the plaintiff's net income for 1973 and 1974. Without these figures, I cannot be sure the plaintiff was not injured, and even with them, assuming they are in line with those given, I doubt that summary judgment should have been granted, although the figures surely would support a conclusion of no antitrust injury if that were all the evidence of damages at trial.

As to certain other aspects of the majority opinion, I also respectfully disagree. The majority finds injury for the increased price paid to Amoco apart from any relationship between profits and sales. I submit that such a result, without further proof, would amount to the granting of a windfall to the plaintiff. If plaintiff's profits were up in 1973, the increase may actually have been caused by the termination, i. e., perhaps Amoco was a more popular brand than Union. In any event, to find injury for increased product cost without a determination of profits for the applicable years, and the relation of the profits to the change-over, I think is inconsistent with *Brunswick* which requires proof of competitive injury before any recovery is permitted.

With respect to changeover costs, the majority argues that plaintiff should be allowed to recover its "substantial administrative expenses in seeking new suppliers and in assisting the retail outlets in switching from Union-brand insignia to Amoco or independent brands." While it may be true that evidence of such is admissible as proof of an item of damages if antitrust injury is otherwise shown, I think it is not the competitive injury required as a prerequisite to a private action for treble damages. The Sixth Circuit, in a dealer termination setting with damages claimed under § 4 of the Clayton Act, has held that a plaintiff whose supply contract is terminated suffers no injury if an adequate supply of a comparable product is available. *Elder-Beerman Stores Corp. v. Federated Department Stores, Inc.,* 459 F.2d 138 (6th Cir. 1972); cf. *United States v. Arnold Schwinn & Co.,* 388

U.S. 365, 381, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1966) (vertically imposed territory restrictions do not, in themselves, violate the Sherman Act if comparable alternative supplies are available). As the court stated in *Elder-Beerman* : "An essential element in attempting to establish the fact of damage because of exclusion from a specified source of supply is a lack of an alternative comparable substitute for the desired merchandise." 459 F.2d at 148.

As discussed above, the record shows without dispute that Lee-Moore had a more than adequate supply since termination, and, indeed, on occasion Lee-Moore sold excess gas to other jobbers. The majority attempts to avoid this line of authority by asserting that Union gas is a unique product. The main reason given for this conclusion, that different brands of gasoline are not comparable products, is that Lee-Moore's switch in brands resulted in lost customers. In *Mullis v. Arco,* 502 F.2d 290 (7th Cir. 1974), the court held that one gasoline is the same as another for purposes of defining the relevant market in a § 2 case even if a dealer would have to pay more to get it from a different supplier following a termination. While the setting of *Mullis* is somewhat different, the reasoning should yet apply in determining what is the same product. And, a concurring opinion in *Elder-Beerman* noted that the plaintiff, a store engaged in selling mattresses, would not be injured if it were shown that he could obtain another line of mattresses, even if it were a less desirable brand. 459 F.2d at 160. I suggest that gas is gas for purposes of determining whether an alternate supply is available, and it is clear that the plaintiff had an abundant supply. Even reading the majority opinion as limiting the range of comparable sources to major brand gasoline, the record shows that Lee-Moore has purchased more major oil company gasoline in every year since it was terminated than it did prior to termination.

I also do not believe plaintiff was injured due to lost sales or customers. As stated

---

**3.** Lee-Moore's net income for the fiscal year ending May 31, 1972 was $24,359. Johnson's for the fiscal year ending April 30, 1972 was $95,408. Lee-Moore's 1975 net income (now merged with Johnson) for fiscal year ending May 31, 1975 was $317,427. Thus, the 1975 net income was 2.66 times larger than the combined 1972 net income.

above, Lee-Moore's sales and profits have increased since its contract was terminated. Thus, even if some customers were lost, many others were gained. Since one set of customers is as good as another, I feel the plaintiff suffered no injury on that account. As the court said in *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752 (2d Cir. 1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973): "We fail to see how [plaintiff-seller] could have lost any profits if customers purchased the same quantity in one year as in a previous year, although the identity of the purchasers changed." The facts in the case at bar are even stronger for the defendant than in *GAF*. After the supply contract was terminated, Lee-Moore had more overall sales and more sales of a major brand. It therefore did not suffer any injury from lost sales.

Under the majority's theory, the plaintiff has suffered an antitrust injury from a lost sale of one brand of a product although the sale of another brand was made, and such an injury from a lost customer although another customer took his place. I do not agree that either correctly states the law. I believe, for antitrust damages, the sale of one brand is as good as another, and the sale to one customer is as good as to another.