**CONTINENTAL AIRLINES, INC., and Continental Express, Inc., Plaintiffs,**

v.

**UNITED AIR LINES, INC., and Dulles Airport Airline Management Council, Defendants.**

No. CIV.A. 00–684–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 22, 2001.

Vanessa Y. Chandler, Vinson & Elkins, Washington, DC, for Plaintiffs.

Andrew Abbott Nicely, Robert Lawrence Bronston, Mayer, Brown & Platt, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this private antitrust suit, an agreement by defendants United Air Lines, Inc. ("United"), and Dulles Airport Airline Management Council ("AMC") to restrict the size of carry-on bags at Washington Dulles International Airport ("Dulles") was found to be an unreasonable restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. *See Continental Airlines,*

*Inc. v. United Air Lines, Inc.,* 126 F.Supp.2d 962, 981–82 (E.D.Va.2001). At issue now are (i) the amount of damages, if any, to be awarded to plaintiffs Continental Airlines, Inc., and Continental Express, Inc. (collectively "Continental"), and (ii) the scope of appropriate injunctive relief.

## I.

The facts underlying this private antitrust suit are more fully set forth in an earlier memorandum opinion resolving the parties' cross-motions for summary judgment.[1] Only a brief recapitulation of the facts and proceedings is necessary here.

Continental and United are well-known air carriers that operate at Dulles. The AMC is an association of air carriers that serve Dulles. In April 2000, defendants agreed, over Continental's objections, to install baggage "templates" to prevent bags larger than approximately ten inches high and fifteen inches wide from passing through the x-ray machines at Dulles's two main security checkpoints. Because all passengers departing from Dulles must pass through one of these two checkpoints, defendants' agreement effectively imposed the carry-on bag size restriction on *all* Dulles carriers, including Continental. Within one week of the installation of the carry-on baggage templates at Dulles, Continental filed suit against defendants for, *inter alia,* violation of Sherman Act Section 1, 15 U.S.C. § 1. Continental complained that it suffered injury as a result of defendants' agreement, as the agreement eliminated the competitive advantage Continental enjoys from its expanded aircraft baggage storage bins and its flexible,

---

1. *See Continental Airlines,* 126 F.Supp.2d at 986. For the reasons stated in the memorandum opinion, defendants' agreement was held violative of Section 1 of the Sherman Act, and, hence, Continental's summary judgment motion was granted, and defendants' summary judgment motion was denied. The parties' cross-motions for summary judgment on the issue of damages were deferred.

"passenger friendly" carry-on baggage policies and practices.

■ The anticompetitive tendencies of defendants' agreement are manifest. Because a carrier's output has both quantitative and qualitative components, including carry-on baggage policies, defendants' agreement "restricts output . . . [by] standardiz[ing], and thereby eliminat[ing] open competition on, an element of the bargain between carriers and passengers" and was, in effect, "an agreement to provide a lower quality product." *Continental Airlines,* 126 F.Supp.2d at 975. And, because there is no procompetitive justification for the agreement, the carry-on baggage size restriction is properly condemned as an unreasonable, and therefore illegal, restraint of trade under an abbreviated application of the Rule of Reason. *See id.* at 978–82. At issue now are the parties' cross-motions for summary judgment as to Continental's damages and the form of an injunction appropriate to remedy defendants' antitrust violation.

## II.

■ Continental's entitlement to damages in this case is governed by Section 4 of the Clayton .Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold damages by him sustained," in addition to costs and reasonable attorneys' fees. 15 U.S.C. § 15(a). In this regard, Continental must establish "an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." *Rosebrough*

*Monument Co. v. Memorial Park Cemetery Assoc.,* 666 F.2d 1130, 1146 (8th Cir. 1981). Where the fact of damage is proven to a reasonable certainty, however, a plaintiff's failure similarly to prove the precise amount of damages does not entitle the defendant to summary judgment, for "[t]he plaintiff's burden of proving the fact of damages under section 4 of the Clayton Act is satisfied by the showing of some damage arising from a given antitrust violation; further proof is relevant only to the amount, and not the fact of damage." *Advance Bus. Sys. & Supply Co. v. SCM Corp.,* 415 F.2d 55, 63 (4th Cir.1969); *see also Zenith Radio Corp. v. Hazeltine Res., Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

As discussed in the earlier memorandum opinion, there is no material dispute of fact that Continental has suffered two distinct types of damages. as a result of defendants' illegal agreement. First, "insofar [as] it is clear on this record that, absent defendants' restrictive agreement, Continental would have been able to attract low-yield passengers from other airlines—and thereby gain market share in this consumer group—Continental suffered injury to its business and property in the form of lost profits." *Continental,* 126 F.Supp.2d at 983 (footnote omitted).[2] Second, "[t]he fact that plaintiffs employed template-lifters at the Dulles baggage screening checkpoints in order to avoid the carry-on re-. striction" qualifies as a [recoverable] "'cost[ ] incurred in mitigating the anticompetitive effects of defendants' antitrust violation.'" *Id.* (quoting *Lee–Moore Oil*

---

**2.** Because the amount of this type of damages could not be determined on the summary judgment record as it then existed, given its lack of quantitative evidence on this point, a further hearing was ordered to determine whether defendants were entitled to summary

judgment on damages or whether plaintiffs were entitled to make a further record on this issue. *See Continental Airlines, Inc. v. United Air Lines, Inc.,* 126 F.Supp.2d 962 (E.D.Va. 2001) (order).

*Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299, 1303 (4th Cir.,1979)). Accordingly, the task at hand is not to determine whether Continental in fact has suffered damages, but rather to determine from the record whether there is a triable issue of fact as to the *amount* of damages to which Continental is entitled.

█ Defendants correctly point out that Continental offered no proof on the amount of profits lost as a result of defendants' illegal agreement to restrict the size of carry-on bags at Dulles. Continental has not estimated the number of passengers it was threatened with losing and has otherwise not submitted quantitative evidence as to lost profits. Indeed, Continental admits that it "has not tried to quantify them or the lost revenues." [3] Thus, a damage award based on lost revenues or profits would be speculative and, therefore, inappropriate here. *See, e.g., Rosebrough,* 666 F.2d at 1147 ("An award of damages may not be based on speculation.").

█ Yet, this does not end the damages analysis, for Continental may recover the proven costs incurred in mitigating the anticompetitive effects of defendants' antitrust violation. In this regard, Continental grounds its damages claim on its decision to employ a third-party contractor—at a cost of approximately $10,000 per month—to assist Continental customers in bypassing the carry-on templates at Dulles security check points. Continental argues that there is no genuine issue of material fact as to the amount of Continental's mitigation expenses of $84,808.95, and that it should be awarded damages treble that amount pursuant to Clayton Act Section 4,

15 U.S.C. § 15. Defendants respond that Continental has not met its burden of demonstrating that its chosen methods of mitigation were reasonably necessary to ameliorate its threatened loss, or that the cost of those methods were commensurate with the potential injury. More specifically, defendants argue that Continental could have mitigated the alleged effects of defendants' restrictive agreement by other, less expensive, more cost-effective means—namely, by providing its passengers Medallions that would have enabled them to bypass the templates.[4] In addition, defendants contend that, by failing to quantify the amount of profits it would have lost in the absence of mitigation, Continental is unable to show that its mitigation expenditures were equal to or less than its potential injury. Defendants' arguments are unpersuasive.

First, defendants have not offered persuasive, admissible evidence showing that the Medallion program allows all Continental passengers to bypass the templates at Dulles security checkpoints. Rather, the record reflects that the Medallion program was intended to be—and in fact was—implemented in a limited fashion, applying only to high-yield and VIP passengers. *See Continental Airlines,* 126 F.Supp.2d at 968–69, 982–83. The Medallion program, in short, was not an effective or reasonable way for Continental to avoid the anticompetitive effects of defendants' agreement. Given this, it is clear that it was reasonable and necessary for Continental to post employees at the security checkpoints to allow all Continental passengers to bypass the templates.

**3.** Plaintiffs' Response to Defendants' Statement of Undisputed Fact, ¶ 135.

**·4.** For a more complete discussion of the Medallion program defendants implemented, *see Continental Airlines,* 126 F.Supp.2d at 968–69. Under this program, United distributed

to each carrier a limited number of tokens that allow certain passengers to bypass the templates at the Dulles security checkpoints and thereby to carry onboard the aircraft larger-sized bags than those allowed to non-Medallion holders. *See id.*

Second, defendants' focus on lost profits as the proper measure of the reasonableness of mitigation efforts is misguided. As noted in the earlier memorandum opinion, "while defendants' agreement to restrict the size of carry-on bags may have little impact on the total number of flights offered or tickets sold, it does amount to an agreement to provide a lower quality product and hence counts as an output reduction." *Continental Airlines*, 126 F.Supp.2d at 975. Put differently, the primary anticompetitive effect of defendants' agreement to restrict the size of carry-on bags is not a reduction in the total number of tickets sold by Continental or any other carrier at Dulles, but rather a reduction in output quality among all airlines at Dulles. Indeed, the very illegality that infects defendants' agreement is the fact that "it standardizes, and thereby eliminates open competition on, an element of the bargain between carriers and passengers." *Id.* Thus, defendants' agreement seeks at once to maintain the status quo ante on number of tickets sold by each affected airline *and* to secure supracompetitive profits for conspiring airlines that would otherwise be competitively compelled to spend more in order to match the quality of service offered by Continental. As a consequence, the agreement damaged Continental insofar as it eliminated its competitive advantage with regard to carry-on baggage policies. In this regard, reasonable steps taken by Continental to restore its competitive advantage—i.e., to "mitigat[e] the anticompetitive effects of defendant[s'] antitrust violation"—are recoverable. *Lee–Moore*, 599 F.2d at 1306.[5]

The uncontradicted record discloses that after Continental exhausted its initial supply of Medallions, it initially attempted to station a regular employee at the West security checkpoint through which most Continental passengers pass. When it became clear that it could not maintain this arrangement with its existing employees, Continental hired an outside contractor to staff the checkpoint with uniformed customer service representatives who identified Continental passengers and lifted the templates for them. *See Continental Airlines*, 126 F.Supp.2d at 968. The undisputed record also reflects the cost Continental incurred in this regard: invoices and receipts reflect that the cost to Continental of these mitigation efforts was $84,808.95—$72,723.00 for personnel through December 31, 2000,[6] $10,000.00 in costs

---

5. In *Lee–Moore*, for example, Union Oil Company violated the antitrust laws by canceling its petroleum supply contract with plaintiff, and the Fourth Circuit held that "administrative expenses [incurred] in seeking new suppliers and in assisting the retail outlets switching from Union-brand insignia to Amoco or independent brands .... may properly be included in the calculation of damages under § 4." *Lee–Moore*, 599 F.2d at 1306. Similarly, in *Advance Business Systems*, the Fourth Circuit held that a clause in the service agreement between the parties that reserved the defendant's right to suspend the agreement as to any copy machines in which other suppliers' paper was used was an illegal tie-in. In this regard, the court upheld the district court's conclusion that "the fair measure of damages to plaintiff ... is the rea-

sonable cost of furnishing service to those customers of plaintiff ... plus the value to plaintiff of ... time spent in offsetting defendant's restrictive practices." *Advance Bus. Sys.*, 415 F.2d at 69. Continental, like the plaintiffs in both *Lee–Moore* and *Advance Business Systems*, was forced to incur reasonable expenses to restore the competitive status quo ante the illegal restriction, and, thus, Continental, like those plaintiffs, is entitled to recover damage for those expenses.

6. Continental was charged and paid the following amounts to staff the West security checkpoint: July 2000, $9,915.50; August 2000, $11,781.00; September 2000, $12,796.00; October 2000, $12,194.00; November 2000, $12,726.00; and December 2000, $13,310.50.

estimated to be incurred in January 2001, and $2,085.95 for uniforms.

█ While defendants do not dispute this amount, they object that these contractor employees also distributed "anti-template propaganda" for which defendants should not be held responsible. Yet, the distribution of this material—even if unnecessary to mitigate the anticompetitive effects of defendants' agreement or otherwise improper [7]—had little or no effect on the amount of Continental's mitigation expenses, as the added effort by the contractor employees was minimal.

In sum, there is no genuine issue of material fact that Continental's mitigation costs totaled $84,808.95, which under Clayton Act § 4 should be trebled to $254,426.85. Thus, Continental is entitled to an award of damages in that amount, plus post-judgment interest at the statutory rate. *See* 28 U.S.C. § 1961.

### III.

█ It is clear from the record that "the continued existence of defendants' agreement threatens Continental with injury to its ability to use its carry-on-baggage-friendly policies to attract customers and gain market share vis-a-vis other carriers at Dulles." *Continental Airlines,* 126 F.Supp.2d at 984. Having shown "threatened loss or damage by a violation of the antitrust laws" under Section 16 of the Clayton Act, Continental is entitled to injunctive relief to remedy this threat and the anticompetitive effects of defendants' illegal agreement. 15 U.S.C. § 26; *see also Zenith,* 395 U.S. at 130, 89 S.Ct. 1562 (holding that a plaintiff seeking injunctive relief "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur"). The question presented here is the appropriate scope of that relief.

Here, defendants have proposed an injunction narrowly tailored to address only the effect of their restrictive agreement on Continental. Defendants' proposed remedy would require United to grant Continental "a supply of Medallions sufficient in quantity to allow each of plaintiff's daily departing passengers from Washington Dulles International Airport to by-pass the baggage sizing templates installed at the airport's security checkpoints." Defendants' proposed order would also require Continental to "distribute such Medallions to their passengers only and not to passengers of any other airline." Defendants argue that this proposal, if adopted, would fully remedy Continental's asserted harm and preserve competition among airlines by allowing airlines at Dulles to compete using different types of carry-on baggage

---

**7.** Continental persuasively argues that the letter merely mitigated the loss and confusion of Continental customers as a result of the templates. The letter, dated April 2000, reads:

Dear Customers,

We apologize for any delay or inconvenience you have experienced at the security screening checkpoint today.

United Airlines recently installed baggage sizing templates on the X-ray machine to limit the carry-ons that their passengers may bring aboard. At Continental we do not have the same restriction, and we are seeking remedies to the problems caused by United's template interfering with our customers' carry-ons.

If your bag is not accepted for screening due to its size, please see the uniformed Continental representative at the checkpoint. We will assist you in clearing the checkpoint.

Should your carry-on not fit in our expanded overhead bins or under-seat space, we can gate-check your bag.

If you have any questions or concerns after your trip, you can reach Continental Customer Care at 1–800–WE–CARE2. Thank you for your understanding.

Continental Express
Continental Airlines
Washington Dulles International Airport

control systems. Such a limited remedy, defendants argue, would at once remedy Continental's injury and comport with the fact that air carriers "operate out of shared airport facilities and thus must form agreements from time to time concerning the use of these facilities." *Continental Airlines*, 126 F.Supp.2d at 977.

. Plaintiffs alternatively propose an injunction that would (i) order defendants to "remove immediately all baggage sizing templates at security screening checkpoints at Dulles"; (ii) "permanently enjoin[ ] [defendants] from agreeing to place baggage sizing templates or other baggage sizing devices at security screening check points or at any other common location through which passengers of Continental Airlines or Continental Express pass at Dulles"; and (iii) "permanently enjoin[ ] [defendants] from entering into any agreement regarding the size of baggage that may be carried to the gate or on board aircraft at Dulles."

▇ The principles guiding the determination of the breadth of the injunctive relief appropriate here are well-settled. The Supreme Court has long instructed that courts should apply Clayton Act § 16 with an eye towards "not merely ... compensat[ing] those who have been directly injured but also ... vindicat[ing] the important public interest in free competition." *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). This is so because "the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve the high purpose of enforcing the antitrust laws." *Zenith*, 395 U.S. at 130–31, 89 S.Ct. 1562. Specifically,

[i]n an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.

*International Salt Co. v. United States*, 332 U.S. 392, 401, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *accord Zenith*, 395 U.S. at 133, 89 S.Ct. 1562. Accordingly, "the standard against which the [injunction] must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct"[8]—that is, whether the relief "(1) put[s] an end to illegal conduct, (2) deprive[s] violators of the benefits of their conduct, and (3) restore[s] competition in the marketplace."[9]

▇ At first blush, it is tempting to adopt defendants' proposed injunction; it is appealing for its apparent precision. Yet, in the end, the governing principles compel the conclusion that defendants' proposed injunction is too narrow and does not remedy the harm to open and unfettered competition posed by defendants' agreement to restrict carry-on bag size at Dulles. That agreement amounts to a horizontal "agreement to provide a lower quality product and hence counts as an output reduction." *Continental Airlines*, 126 F.Supp.2d at 975. As a result, it "distorts the allocation of services through the operation of the airline market mechanism and thereby substantially reduces aggregate consumer welfare as does fixing the price of airline tickets." *Id.* at 975–76. The agreement thus violates the antitrust laws not merely because it specifically prevents Continental from competing with

8. *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

9. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1059 (6th Cir.1984) (internal quotation marks omitted).

other carriers through the provision of greater onboard storage capacity and flexible carry-on policies, but also (and primarily) because of its pernicious effect on competition in the market for air carrier services as a whole. Although this suit necessarily focuses in part on the restraint's effect on Continental—and the appropriate injunctive remedy accordingly should at least palliate Continental's particularized injuries—the pernicious anticompetitive effects of defendants' agreement infect competition among *all* carriers at Dulles. In this regard, although, as defendants correctly note, traditional equitable principles dictate that "injunctions must be tailored to the specific harm to be prevented,"[10] because the harm to be prevented here—as in all private antitrust cases—goes beyond the harm occasioned on the individual plaintiff and extends to the harm to open, unfettered competition as a whole, the injunctive relief granted in this case should "effectively pry open competition to a market that was previously closed by illegal restraints" and should not myopically focus solely on Continental's harm. *Wilk v. American Med. Ass'n*, 895 F.2d 352, 371 (7th Cir.1990).[11]

Seeking to avoid this conclusion, and in support of a narrower, Medallion-based remedy, defendants urge a balancing of Continental's interests in allowing its passengers to bypass the templates against defendants' interests in employing what they believe to be an effective carry-on baggage control system. In this regard, defendants (rather belatedly)[12] offer evidence showing that, if forced to abandon the templates, United alone would have to

---

**10.** *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir.2000); *see also Zenith*, 395 U.S. at 130, 89 S.Ct. 1562 (noting that Clayton Act § 16 invokes "traditional equitable principles"); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir.1992) ("[I]njunctions must be narrowly drawn and precise.").

**11.** Thus, courts have repeatedly rejected the argument advanced by defendants that injunctive relief should be tailored so narrowly as to remedy only the injuries suffered by the plaintiff. In *Wilk*, for example, the Seventh Circuit rejected the American Medical Association's ("AMA") argument that the district court's decision to enjoin it from enforcing its restriction on referrals between member physicians and all chiropractors was overbroad because the relief was not limited to the individual plaintiffs. *See Wilk*, 895 F.2d at 370–71. Noting that such an argument "ignores the public interest served by private antitrust suits," the court affirmed the injunction as providing relief "not only to the plaintiff chiropractors, but also in a sense to all consumers of health care services." *Id.* at 371. Because "[e]nsuring that medical physicians and hospitals are free to professionally associate with chiropractors … likely will eliminate such anticompetitive effects of the boycott as interfering with consumers' free choice in choosing a product (health care provider) of

their liking," the court held that "competition is served by the injunction." *Id.; see also Chicago Prof'l Sports Ltd. v. NBA*, 754 F.Supp. 1336, 1339 (N.D.Ill.1991) (enjoining the enforcement of the NBA's restriction on the number of superstation telecasts as to all teams and all stations, and not just to the plaintiffs), *aff'd*, 961 F.2d 667 (7th Cir.1992).

**12.** Defendants, for the first time, presented at the recent hearing on remedies and in their final supplemental memorandum on the form of an appropriate injunction, the statement of Karen Burke, the General Manager for United at Dulles, who stated, *inter alia*, that "[i]f United were unable to use templates at the security checkpoints, I would be required to station more personnel at United's thirty-eight gates to monitor and control oversized carry-on luggage, a function currently provided by the templates. The aggregate annual cost to United of providing those personnel would be approximately $1 million." Yet, when asked in her earlier deposition to identify all benefits that United believes it can glean from the carry-on restriction, Burke did not identify these cost savings. Moreover, when cross-examined at the hearing, Burke conceded that she only recently quantified these cost savings, and that, despite the potential, imminent end of defendants' agreement, United has not hired any personnel to serve this purpose.

spend approximately $1 million every year in hiring more personnel to minimize the disruption. This increase in costs, defendants argue, far outweighs the arguably minimal burden on Continental and its passengers that would result from adopting defendants' proposed Medallion-based remedy that preserves the agreement and templates as to all other Dulles carriers. Defendants' argument is unpersuasive.

■ First, defendants' proposed injunction would impose unreasonable burdens on Continental and its passengers to accommodate defendants' restriction. It is clear that even assuming Continental is given as many Medallions as it requests, Continental passengers would still largely be unable to take advantage of Continental's baggage-friendly policies, the prime objective of which is to provide passenger convenience by allowing all customers to proceed directly to the gate, even with larger carry-on bags, if they prefer to do so. These passengers, specifically, would still face additional inconvenience and unnecessary delays occasioned by the Medallion program. To begin with, most Continental passengers would likely not learn of the Medallion program until they are turned away at the Dulles security checkpoints after a possibly significant wait in line and sent to the main ticket counter. In any event, even were Continental passengers made aware (at Continental's expense) of the availability of Medallions prior to entering the checkpoints, they would nevertheless have to wait in line and check in at the main ticket counter to obtain a Medallion under defendants' plan. Indeed, because Continental would be required to provide Medallions "to their passengers only and not to passengers of any other airline," Continental would have to verify each customer's reservation before issuing the passenger a Medallion, lest Continental would risk violating the injunction. These delays would adversely impact particularly those passengers with "e-tickets" that are purchased by travelers in large part for the very convenience of not having to wait and check-in at main ticket counters. In this regard, defendants' plan would burden and penalize the very same passengers that Continental is trying to attract or maintain with its carry-on policies.[13] Simply put, defendants' proposed limited, Medallion-based remedy imposes burdens on Continental and its customers that dissipate, at least in substantial measure, the proposal's efficacy in remedying the agreement's adverse effects on Continental and its passengers.

Second, and more importantly, defendants' claimed increased costs are entitled to little, if any, weight in balancing "the public interest and private needs as well as ... competing private claims." *Zenith*, 395 U.S. at 131, 89 S.Ct. 1562. This is so because defendants' claimed increased costs are merely the costs they would otherwise incur if forced to compete in an open market for carry-on baggage capacity

---

**13.** Defendants' Medallion-based plan relies on security personnel otherwise responsible solely for manning the x-ray machine and magnetometer also to implement the Medallion regime. In this regard, defendants' proposal also raises significant security concerns. Moreover, defendants' plan may result in continuing judicial supervision of whether defendants have provided Continental a sufficient supply of Medallions "at regular intervals" and "as additionally requested by plaintiffs" and whether Continental has taken adequate steps to ensure that it does not distribute Medallions to customers of other carriers. Instead of specifically addressing these concerns over the Medallion program, however, defendants place the burden on Continental to "devise a workable distribution system." This is inappropriate, for "[p]laintiffs do not ordinarily have an obligation to change their behavior to escape injury from the unlawful acts of defendants." *Chicago Prof'l Sports*, 754 F.Supp. at 1353.

and policies. Defendants' agreement, it is important to recall, "does not promote competition itself, but rather only helps individual carriers in competition with other carriers by relieving them of the competitive pressure to offer better products and services with respect to carry-on baggage." *Continental Airlines*, 126 F.Supp.2d at 980. In this regard, defendants cannot be allowed to perpetuate their anticompetitive agreement on the ground that open competition among carriers on carry-on baggage capacity and policies is too expensive or otherwise imposes too heavy a burden on defendants' bottom line.[14] As defendants prominently noted in their summary judgment papers, the antitrust laws were enacted for "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Thus, insofar as defendants' agreement to restrict carry-on bag size at Dulles eliminates competition through product standardization and a reduction in output, an injunction that "effectively pr[ies] open to competition a market that has been closed by defendants' illegal restraint[ ]" is appropriate. *International Salt*, 332 U.S. at 401, 68 S.Ct. 12.[15] In this regard, relief that enjoins defendants' restrictive agreement makes it more likely than not that other airlines that are parties to the agreement will eventually join in the competitive fray over carry-on baggage capacity and policies,[16] and that healthy and open competition in the provision of high-quality airline service among all carriers at Dulles will flourish.

## IV.

For all these reasons, a final judgment shall issue awarding Continental treble damages in the sum of $254,426.85, plus post-judgment interest at the statutory rate, and enjoining defendants from employing or agreeing to employ any baggage sizing template or device at Dulles security checkpoints, or at any common

**14.** *See, e.g., Chicago Prof's Sports,* 754 F.Supp. at 1359 ("Maximizing revenues . . . [is] not [a] legitimate justification [in itself] for restraining trade by limiting output. 'We do it because it's more profitable' is not a defense under the Sherman Act."); *cf. Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 346, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (noting that the Sherman Act "has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies") (quoting *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 220–21, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)).

**15.** Again, it is important to note that at least four other carriers dissented from defendants' agreement to restrict carry-on bag size at Dulles. *See Continental Airlines,* 126 F.Supp.2d at 968. Defendants' proposed limited injunctive relief would require each of these dissenting carriers, or any other carrier that wishes to avoid defendants' restrictions, to file suit against defendants. Yet, it is apparent that insofar as these dissenting carriers, like Continental, wish to compete with defendants on carry-on capacity and policies, injunctive relief should also extend to allow these other carriers to compete, for "the fact is that one injunction is as effective as 100, and concomitantly, that 100 injunctions are no more effective than one." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). It is therefore doubtful that defendants' limited, Medallion-based remedy, which is focused on Continental alone, achieves a fair balance between the consuming public's interest in open competition, defendants' interests in maintaining their agreement, and all dissenting carriers' interests in avoiding defendants' restrictions.

**16.** Nor is this likelihood of increased competition limited to the four airlines who joined Continental in dissenting from defendants' agreement. *See Continental Airlines,* 126 F.Supp.2d at 968. Even United, as counsel disclosed in oral argument, is currently engaged in a carry-on baggage bin expansion program.

location through which Continental passengers may pass.